GAZIANO, J.
*243 **367 In this appeal, we are asked to consider whether dredging and beach nourishment projects undertaken by the town of Dennis violated Massachusetts environmental regulations by requiring that materials dredged from the mouth of a tidal river be deposited on a publicly-owned beach, rather than on an adjacent, privately-owned beach. The plaintiffs, homeowners and a homeowners' association, commenced an action in the Superior Court, pursuant to G. L. c. 214, § 7A, against the town, seeking injunctive relief and a declaratory judgment on their claim that the town's actions violated a Department of Environmental Protection (DEP) regulation designed to protect beaches that are downdrift from jetties from loss of sediments caused by the jetties. After both parties filed cross motions for summary judgment, a Superior Court judge concluded that the town's extension of a jetty at the mouth of Swan Pond River in the early 1990s triggered the requirements of 310 Code Mass. Regs. § 10.27 (2014), and allowed the plaintiffs' motion. The judge also issued an injunction permanently requiring the town "periodically [to re]dredge [the river]" and to deposit the dredged material on the plaintiffs' private beach. The town appealed, and we transferred the case from the Appeals Court on our own motion.
We conclude that judgment should not have entered for the plaintiffs, and that judgment instead should have entered for the town. Among other things, the plaintiffs have introduced nothing in the summary judgment record showing that the town's extension of the jetty violated, or even triggered, the requirements of 310 Code Mass. Regs. § 10.27(4)(c). In addition, as the judge found, the town's subsequent dredging of the river did not trigger the requirements of that regulation. Because the plaintiffs would be unable to prove an essential element of their claim at trial, the order of injunction must be vacated, and the judgment allowing summary judgment for the plaintiffs must be reversed.
1. Statutory overview. A number of potentially overlapping statutes and regulations are at issue in this case. Because an understanding of the interrelationships among them is essential to understanding the issues raised, we describe each in some detail.
General Laws c. 214, § 7A,[2] an environmental citizen suit provision, allows a group of at least ten residents of the Commonwealth **368 to file a complaint in the Superior Court when damage to the environment is occurring or is about to occur as a result of an action by, inter alia, a municipality, that is in "violation of a statute, ordinance, by-law or regulation the major purpose of which is to prevent or minimize damage to the environment." See Boston v. Massachusetts Port Auth., 364 Mass. 639, 645, 308 N.E.2d 488 (1974). The statute defines "damage to the environment" as "any destruction, damage or impairment, actual or probable, to any of the *244 natural resources of the [C]ommonwealth, whether caused by the defendant alone or by the defendant and others acting jointly or severally." G. L. c. 214, § 7A.
The wetlands protection act, G. L. c. 131, § 40 (act), "was created to protect wetlands from destructive intrusion," Healer v. Department of Envtl. Protection, 73 Mass.App.Ct. 714, 716, 901 N.E.2d 161 (2009), and, inter alia, governs the dredging of wetlands and lands bordering waters. See G. L. c. 131, § 40. The act requires, in relevant part, that a party wishing to dredge first must file a written notice with a local issuing authority, often, as in this case, a local conservation commission, which exercises local regulatory authority under the act. See G. L. c. 131, § 40. Following a hearing, the authority shall determine if the project affects an area that is "significant to public or private water supply, to the groundwater supply, to flood control, to storm damage prevention, to prevention of pollution, to protection of land containing shellfish, to the protection of wildlife habitat or to the protection of fisheries." Id. If so, the issuing authority issues a written order that "impose[s] such conditions as will contribute to the protection of [these] interests ... and all work shall be done in accordance therewith." Id. No work may be done without "receiving and complying with [this] order of conditions." Id. DEP has promulgated regulations under G. L. c. 131, § 40, to protect wetlands. See 310 Code Mass. Regs. §§ 10.00 (2014). Specifically, **369 310 Code Mass. Regs. §§ 10.21 - 10.37 are applicable to all dredging covered under G. L. c. 131, § 40. See 310 Code Mass. Regs. § 10.21. These regulations are "performance standards ... intended to identify the level of protection the issuing authority must impose in order to contribute to the protection of the interests of [G. L.] c. 131, § 40." Id. If the issuing authority determines that a project will affect one of the protected interests under the act, the issuing authority must "order specific measures and requirements for each proposed project which will ensure that the project is designed and carried out consistent with the required level of protection," and must memorialize those requirements in an "[o]rder of [c]onditions which is understandable and enforceable." Id.
A number of other State and Federal statutes and regulations concerning water quality also are applicable to the areas at issue in this case. General Laws c. 21, § 27, provides that "[i]t shall be the duty and responsibility of the division [of water pollution control] to enhance the quality and value of water resources and to establish a program for prevention, control, and abatement of water pollution" in the Commonwealth. DEP has issued water quality regulations pursuant to G. L. c. 21, § 27, and G. L. c. 91, §§ 52 - 56. See 314 Code Mass. Regs. §§ 9.00 (2014). Section 9.01(1) of those regulations provides that they "establish[ ] procedures and criteria for the administration of Section 401 of the [F]ederal Clean Water Act, 33 U.S.C. [§] 1251." Section 9.01 (3)(a) of those regulations, in particular, seeks to "protect[ ] the public health and restor[e] and maintain[ ] the chemical, physical, and biological integrity of the water resources of the Commonwealth by establishing requirements, standards, and procedures" for dredging. Title 310 Code Mass. Regs. § 9.40(4)(a) (2017), more specifically, governs the spoils of dredging projects. As relevant here, it provides that "in the case of a publicly-funded dredging project, such material shall be placed on publicly-owned eroding beaches." See id.
Finally, G. L. c. 30B, § 15 (a ) and (b ), of the procurement act, provides that a "governmental body shall dispose of a tangible supply that is no longer useful to the governmental *245 body but having resale or salvage value," through "competitive sealed bids, public auction, or established markets."
2. Background. We recite the facts from the judge's statement of "undisputed facts revealed by the summary judgment record," supplemented by other uncontested facts in the record. See Chin v. Merriot, 470 Mass. 527, 529, 23 N.E.3d 929 (2015).
**370 a. Historic dredging at mouth of Swan Pond River. Plaintiff Miramar Park Association owns lot 88 on Land Court Plan 11503-J, a parcel of land on the Nantucket Sound shoreline in the Dennisport area of the town; lot 88 contains a private beach known as Miramar Beach. The individual plaintiffs own easements appurtenant to their properties for the use of Miramar Beach and the upland area of lot 88 for recreational purposes. Lot 88 is located east of the eastern shore of Swan Pond River and Miramar Road, a few lots east of the mouth of the river as it empties into Nantucket Sound. Lot 87 on Land Court Plan 11503-J, and lot 84 on Land Court Plan 11503-I, formerly owned by the same owner who sold the Miramar Beach parcel to the Miramar Beach Association, lie along the shoreline to the west of lot 88. One of the individual plaintiffs, Michael Breen, owns lot 87, to the east of Miramar Road, and lot 84, to the west of that road. In addition, two other plaintiffs, Annemarie and Dean Wasniewski, hold easements over Lot 87.
On the western side of the Swan Pond River inlet is a stone jetty. The record does not establish when and by whom the jetty was constructed. A study conducted in 2010 by the Woods Hole Group, Inc. (Woods Hole), on behalf of the town commented that the jetty was in existence at least by 1850; a study conducted by a geologist on behalf of the plaintiffs noted that the jetty was constructed between 1935 and 1943. The jetty traps littoral drift material as it is carried along the predominantly west to east direction of the currents in this part of Nantucket Sound. The jetty does not have a sand by-pass system, which would transfer sediment to the eastern side of the inlet. See 310 Code Mass. Regs. § 10.27(4)(c).
The mouth of Swan Pond River periodically becomes partially filled with sand. This results in reduced tidal flow, which leads to algae blooms, fish kills, and foul odors upstream along the river and in Swan Pond. To facilitate boat navigation and improve water flow, the town has conducted periodic dredging operations at the mouth of Swan Pond River since at least 1980. It dredged the entrance to the river in 1980, 1984, 1988, 1997, 1998, 2000, 2010, and 2014. A planned dredging in 2016 did not take place. The locations of the placement of the fill from the three dredges in 1980, 1984, and 1988 are not indicated in the record. Thereafter, the town has placed sediment removed during the dredging at West Dennis Beach, a public beach located approximately three-quarters of a mile west of the jetty; in the area immediately **371 landward of the jetty, to the west of the river; and, in 1996, on Miramar Beach as well as on West Dennis Beach. After the town deposited the spoils on Miramar Beach, the condition of the beach improved. In May, 1990, the town acquired an easement over property near the western mouth of Swan Pond River, three lots from the coastline, along the river's edge, in conjunction with an engineering study and other efforts to improve water flow and navigation on Swan Pond River. The easement over lot 3-A includes the right to access the property for "dredging, rip rap and environmental purposes."[3] *246 At some point in the early 1990s, apparently before October, 1992,[4] the town extended the then existing jetty on the western side of the mouth of the river northward, further upriver, in an effort to prevent the erosion of the western shoreline of the inlet. There is no indication in the summary judgment record whether any permits were obtained for this work from the town's conservation commission or from any relevant State or Federal regulatory body, and, if so, what conditions, if any, were placed on it.[5]
b. 2010 and 2014 dredging and comprehensive permit. There **372 are nineteen public beaches and three rivers within the town's borders. In 2010, in preparation for applying for a comprehensive permit from various local, State, and Federal authorities, the town commissioned a study and report from Woods Hole concerning the comprehensive needs for dredging and beach nourishment throughout the town. The report included a section on Swan Pond River, which noted the need for "a program of maintenance dredging," in intervals of from one to ten years, in order to "maintain adequate tidal circulation within the Swan Pond River." In November, 2010, the plaintiffs commissioned a study of Miramar Beach, with a particular focus on the impact of the jetty on beach erosion. The Woods Hole study was submitted with the town's environmental notification form for an emergency project in 2009 to dredge Swan Pond River and to construct a beach dune at West Dennis Beach. It also was submitted with the town's expanded environmental notification form filed with the Secretary of the Department of Energy and Environmental Affairs in conjunction with the town's "ten-year comprehensive dredging and beach nourishment plan."
Prior to dredging the mouth of Swan Pond River in 2010, the town acquired permits from a number of local, State, and Federal agencies to conduct dredging and beach nourishment specifically at Swan Pond River and West Dennis Beach, respectively.
*247 The town acquired two permits, to dredge the river and to nourish West Dennis Beach, from the conservation commission, pursuant to the wetlands protection act. The commission approved the dredging and beach nourishment projects according to the town's wetlands bylaw, which is "independent of the Wetlands Protection Act" and provides "the Commission shall impose conditions, which the Commission deems necessary or desirable to protect those wetland values, and all activities shall be in accordance with those conditions." See Dennis Wetlands Bylaw at 4, 5, http://www.town.dennis.ma.us/Pages/DennisMA_BComm/conservation/Rules% 20and% 20Regs/Bylaw.pdf [https://perma.cc/8UGF-92VD] ). The conservation commission issued both permits with orders of conditions.[6]
**373 In August, 2009, the town also received a waiver of the requirement to prepare an environmental impact report and a public benefits determination from the Executive Office of Energy and Environmental Affairs. The Secretary of the Executive Office of Energy and Environmental Affairs (Secretary) concluded that the construction of the beach dune at West Dennis Beach would "enhance the sediment-starved beach and protect against continuous storm damage. In addition, endangered shorebird habitat will be enhanced." In making this determination, the Secretary considered supportive written comments from the following organizations: the Massachusetts Division of Marine Fisheries, the Cape Cod Commission, the Natural Heritage and Endangered Species Program, the Massachusetts Board of Underwater Archaeological Resources, and the Massachusetts Department of Environmental Protection (Southeast regional office).
After receiving the 10-year permits for the Swan Pond River dredging project and the West Dennis Beach nourishment project, the town dredged the mouth of Swan Pond River in 2010. As specified in the permits, the town used the spoils of the 2010 dredging to construct a sand dune to protect a failing bulkhead on West Dennis Beach that protects a public parking lot and endangered species nesting areas. The erosion from the dune is intended to protect the beach from severe erosion from winter storms.
The then president of the Miramar Avenue Association[7] sent a letter to the town about the town's plans to transport the sediment to the public West Dennis Beach, rather than placing it on Miramar Beach. In response, the town's director of natural resources wrote to the association that the placement of the spoils on Miramar Beach in 1996 had been done under the permits in effect for that particular project; the director cited an earlier communication from 1994, explaining that, after the permits expired, "the Town will have to go through a new permit process again and seek new permits. Any new permit would give the Town the right to seek any new disposal area ... in the best interest of the Town."
With respect to its comprehensive ten-year dredging and beach nourishment plan, the town thereafter similarly received a number of separate approvals from DEP for both the dredging project **374 and the beach nourishment project.[8] Permits *248 for both projects were received pursuant to the State waterways program, G. L. c. 91, §§ 52 - 56, which provides that DEP "shall supervise the transportation and dumping of all material dredged in the tide waters of the commonwealth," including by employing an inspector at the expense of the permittee. The town also received a water quality certification for the dredging plan, pursuant to G. L. c. 21, §§ 26 - 53, and the Massachusetts environmental policy act, G. L. c. 30, §§ 61 - 62H.
In 2015, the Executive Office of Energy and Environmental Affairs investigated and reviewed the town's proposed comprehensive ten-year dredging and beach nourishment plan; as part of this process, the office reviewed written comments and independent reviews submitted by a number of State and Federal agencies, including the Board of Underwater Archaeological Resources, the Division of Marine Fisheries, DEP, the Division of Fisheries and Wildlife's natural heritage and endangered species program, the Cape Cod Commission, and the Massachusetts Office of the Federal Coastal Zone Management program of the National Oceanic and Atmospheric Administration. In its letter, DEP noted that its regulation, 310 Code Mass. Regs. § 9.40(4), requires that spoils from publicly-funded dredging projects be placed on public beaches. Public comments also were solicited and received; some of the plaintiffs submitted comments, which the Secretary noted in his final report. In October, 2015, the Secretary determined that the ten-year comprehensive plan was of public benefit, and that there was no need for the town to submit an environmental impact report. The Secretary commented that the ten-year plan would allow the town to use the spoils of dredging to "nourish the highest priority areas and allow[s] for effective use of Town and County resources."
After the determination under the environmental policy act that no environmental impact statement was required, the town's comprehensive dredging and beach nourishment project was reviewed by the individual agencies whose permits were necessary to implement the ten-year comprehensive plan. The town also filed the plan with the Division of Fisheries and Wildlife, as part **375 of the agency's role in ensuring compliance with the endangered species act, G. L. c. 131A. The Division submitted positive comments.
In September, 2014, the town announced plans to conduct maintenance dredging at the mouth of Swan Pond River, under its then-current dredging and beach nourishment permits specific to Swan Pond River and West Dennis Beach. To complete this dredging, the town had received a general permit from the United States Army Corps of Engineers in March, 2014; unlike the ten-year permits from the DEP and the conservation commission, the Army Corps of Engineers permit was issued for a one-year period, to expire in January, 2015. The plaintiffs again requested that the spoils be used to nourish Miramar Beach. The town asserted that it was prohibited from doing so by 310 Code Mass. Regs. § 9.40(4)(a), which requires that spoils from publically-funded dredging projects be used to nourish public beaches.
Since the dredging in 2014, sediment has built up in the mouth of Swan Pond River. Plans were in place to dredge the river again in 2016; that dredging did not take place, in part because of the timing of the renewal of the permit from the Army *249 Corps of Engineers, which had expired in January, 2015.
c. Prior proceedings. This litigation was begun in September, 2014, two days before dredging of Swan Pond River was to start, when the plaintiffs commenced an action in the Superior Court pursuant to G. L. c. 214, § 7A, seeking a declaratory judgment and temporary and permanent injunctions preventing the town from dredging the mouth of Swan Pond River unless the town placed the spoils on Miramar Beach. The plaintiffs sought the temporary injunction to prevent alleged imminent harm to the environment due to the town's planned dredging of Swan Pond River. The plaintiffs claimed that the town would be in violation of 310 Code Mass. Regs. 310 § 10.27(4)(c) if it did not place the spoils from dredging Swan Pond River on Miramar Beach. A Superior Court judge denied the plaintiffs' motion for a temporary injunction.[9] In September, 2016, the parties filed cross motions for summary judgment.
**376 After a hearing in January, 2017, a different Superior Court judge allowed the plaintiffs' motion for summary judgment and denied the town's cross motion. Although not an issue raised in the plaintiffs' complaint or in their motion for summary judgment, the judge determined that the town had triggered the obligations of 310 Code Mass. Regs. § 10.27(4)(c) when it repaired and lengthened the jetty in the early 1990s.[10] The judge concluded that the town violated the regulation by failing to add a sand bypass system to the jetty, and that the regulation, therefore, "creates an ongoing obligation by the Town, after repairing and expanding the jetty, to offset its adverse effects on down drift beaches such as Miramar Beach." In addition, the judge issued an injunction compelling the town "periodically [to] dredge Swan Pond River to re-nourish Miramar Beach pursuant to 310 Code Mass. Regs. § 10.27(4)(c)." The injunction stated also that "the Town of Dennis is permanently enjoined from violating 310 Code Mass. Regs. § 10.27(4)(c)." The judge rejected the plaintiffs' contention that the town must renourish Miramar Beach every time that the area is dredged, instead concluding that the regulation only requires periodic renourishment; he noted also that the town has a "significant public interest in nourishing eroding Town-owned beaches."
3. Discussion. a. Standard of review. "Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law."
*250 Boazova v. Safety Ins. Co., 462 Mass. 346, 350, 968 N.E.2d 385 (2012), citing Mass. R. Civ. P. 56 (c), as amended, 436 Mass. 1404 (2002). Where there is a "developed summary judgment record[, as] in this case, the plaintiff[s] must establish that [they have] a reasonable expectation of proving each element of a prima facie case ...." Beal v. Selectmen of Hingham, 419 Mass. 535, 541, 646 N.E.2d 131 (1995).
"Our review of a motion judge's decision on summary judgment **377 is de novo, because we examine the same record and decide the same questions of law." Kiribati Seafood Co. v. Dechert, LLP, 478 Mass. 111, 116, 83 N.E.3d 798 (2017). "In a case like this one where both parties have moved for summary judgment, the evidence is viewed in the light most favorable to the party against whom judgment [has entered]" (citation omitted). Boazova, 462 Mass. at 350, 968 N.E.2d 385.
b. Cause of action under G. L. c. 214, § 7A. As discussed, G. L. c. 214, § 7A, allows a group of ten residents to seek an injunction in the Superior Court when "damage [is] caused or [is] about to be caused" through actions that "constitute[ ] a violation of a statute, ordinance, by-law or regulation the major purpose of which is to prevent or minimize damage to the environment." The wetlands protection act requires that projects that affect wetlands, including dredging, and that affect interests identified in the act, may take place only after receipt of a permit from an appropriate issuing body, here, the conservation commission. The proponent of a project must provide at least twenty-one days' written notice of the intended action, and a public hearing must be conducted within twenty-one days of receipt of the notice. G. L. c. 131, § 40. In granting permission for projects that affect interests covered by the act, if the local authority determines that the area of the proposed work "is significant to" specific noted interests, such as "to the protection of wildlife habitat" or "storm damage prevention," the local authority must issue such an order of conditions "as will contribute to the protection of [these] interests."[11] See id. The statute further requires that no work may be done without **378 "receiving and complying with [this] order of conditions." Id. Projects affecting wetlands that are undertaken without such a permit, or that, when executed, do not comply with the order of conditions, are in violation of the act.
c. 2014 dredging project. As stated, in their complaint, filed two days before *251 dredging was scheduled to commence, the plaintiffs contended that the 2014 dredging project would cause environmental harm because it violated 310 Code Mass. Regs. § 10.27(4)(c). On appeal, however, the plaintiffs argue that the motion judge properly granted summary judgment on the ground that the town triggered application of 310 Code Mass. Regs. § 10.27(4)(c) when it extended the jetty at some point in the early 1990s, and that these modifications created on ongoing obligation on the part of the town periodically to nourish Miramar Beach.
On this record, we are unable determine whether any violation of the wetlands protection act has occurred as a result of the town's periodic dredging of Swan Pond River, as authorized under the 2010 dredging permit, or the placement of the spoils on West Dennis Beach, as authorized under the 2010 beach nourishment permit. See discussion, infra. There is no evidence in the record that, by its 2010 and 2014 dredging of Swan Pond River, the town violated any terms of the order of conditions issued under the 2010 ten-year permits for the dredging of Swan Pond River or the 2010 ten-year permits for nourishment of West Dennis Beach.
The 2010 permit from the conservation commission, under which the town conducted the challenged dredging in 2014, did not implicate 310 Code Mass. Regs. § 10.27(4)(c), because the project did not affect the construction of the jetty. See Code Mass. Regs. § 10.27(4)(c) ("Any ... jetty ... shall be constructed as follows ..."). Rather, as the town maintains, the dredging project applied to "land under ocean," which is covered by 310 Code Mass. Regs. § 10.25 rather than by 310 Code Mass. Regs. § 10.27(4)(c). Consistent with his conclusion concerning the repair and extension of the jetty, the motion judge properly determined that the dredging project itself, rather than the permits receive for the project, did not trigger the requirement of 310 Code Mass. Regs. § 10.27.
**379 d. 1990s jetty extension. Before turning to the judge's finding that the 1990s jetty extension project implicates 310 Code Mass. Regs. § 10.27, we reiterate that the plaintiffs' complaint did not allege a violation of 310 Code Mass. Regs. § 10.27 arising out of the extension of the jetty in the early 1990s. The complaint asserted only that "[t]he dredging that the Town of Dennis intends to perform [the 2014 dredging], coupled with the Town's intent to transport the dredge material to an updrift beach more than a mile away, violates 310 [Code Mass. Regs. §] 10.27(4)(c)."[12]
On appeal, the plaintiffs argue that we should affirm the allowance of their motion for summary judgment, and the injunctive order that the town "periodically [must] re-nourish Miramar Beach," because "[ 310 Code Mass. Regs.] § 10.27(4)(c) creates an ongoing obligation by the Town ... to offset the adverse effect" of expanding the jetty on the east side of the inlet to Swan Pond River in the early 1990s. We do not agree. On this record, the plaintiffs were not entitled to summary judgment in their favor; to the contrary, summary judgment must enter for the town.[13] Even if it had *252 been timely made, and even if it had been raised in their complaint and in their motion for summary judgment, on this record, the plaintiffs have failed to prove an essential element of that claim.
The judge found that the town's extension of the jetty in the 1990s created an obligation under 310 Code Mass. Regs. § 10.27 requiring the town periodically to dredge the mouth of Swan Pond River and to deposit the spoils on Miramar Beach. The regulation itself, however, imposes no such obligation on jetty owners. Title 310 Code Mass. Regs. § 10.27 is a "performance standard" to guide local conservation commissions in issuing permits under the act. Title 310 Code Mass. Regs. § 10.21 introduces the sections that follow, 310 Code Mass. Regs. §§ 10.21 - 10.37, as "performance standards [that] are intended to identify the level of protection the issuing authority must impose in order to contribute to the protection of the interests of **380 [G. L. c.] 131, § 40." See 310 Code Mass. Regs. § 10.01(2) ("The purpose of 310 [Code Mass. Regs. §§] 10.00 is to define and clarify that process by establishing standard definitions and uniform procedures by which conservation commissions and [DEP] may carry out their responsibilities under [G. L.] c. 131, § 40").
When determining whether to issue a permit under G. L. c. 131, § 40, the issuing authority (here, the conservation commission) is required to consider the nature of the proposed project and whether it would affect any of the protected interests. If a project does affect those interests, the issuing authority must consider what, if any, conditions to place upon a permit such that the conditions adequately can protect the interests which might be affected by the proposed project. See 310 Code Mass. Regs. § 10.21. In issuing the 2010 dredging permit, for example, the conservation commission referenced the act and attached four "additional conditions" to the permit. It is only through the permitting process that an issuing authority may attach conditions to a project; thereafter, if a permit is issued and conditions are imposed, those conditions place an obligation on the applicants. See 310 Code Mass. Regs. § 10.21. If the jetty extension that the town conducted at some point presumably after May, 1990, and before October, 1992, triggered the requirements of 310 Code Mass. Regs. § 10.27, that could be so only because of an order of conditions that was issued by the conservation commission at that point, in conjunction with a permit to extend the jetty, prior to the undertaking of the modifications.[14] Any obligation on the part of the town to renourish Miramar Beach would have been memorialized in an order of conditions issued by the conservation commission in conjunction with the maintenance work on the jetty.
Nowhere in the summary judgment record, however, is there any information concerning a permit to repair or extend the jetty **381 at any point in the 1990s (or at any other time) that might have been issued by the conservation commission under *253 G. L. c. 131, § 40. As the order of conditions, if one ever existed, is absent from the record, we are unable to determine whether the town ever had any obligation to renourish Miramar Beach as a result of its modifications to the jetty. Contrary to the judge's determination, any such obligation may not flow directly from the regulation, and the potential source of the obligation -- the order of conditions -- is missing from the record, or may never have existed. This gap in the record is consistent with the fact that the plaintiffs did not make the argument upon which the judge based his decision in their complaint or in their motion for summary judgment.[15]
Accordingly, the plaintiffs have failed to establish that the town violated a statute or regulation "the major purpose of which is to prevent or minimize damage to the environment," as would have been required to establish their claim under G. L. c. 214, § 7A.[16] The summary judgment record does not indicate that the town had any obligation to renourish Miramar Beach under an order of conditions from the conservation commission issued in conjunction with a permit to expand the jetty in the early 1990s, or at any other time. Given that the plaintiffs have failed to prove an essential **382 element of their case, summary judgment must enter for the town. See Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716, 575 N.E.2d 734 (1991).
3. Conclusion. The order enjoining the town periodically to nourish Miramar Beach is vacated and set aside. The order granting summary judgment to the plaintiffs is reversed. The case is remanded for entry of judgment for the defendant.
So ordered.

General Laws c. 214, § 7A, provides, in relevant part:
"The [S]uperior [C]ourt for the county in which damage to the environment is occurring or is about to occur may, upon a civil action in which equitable or declaratory relief is sought in which not less than ten persons domiciled within the commonwealth are joined as plaintiffs ... determine whether such damage is occurring or is about to occur and may, before the final determination of the action, restrain the person causing or about to cause such damage; provided, however, that the damage caused or about to be caused by such person constitutes a violation of a statute, ordinance, by-law or regulation the major purpose of which is to prevent or minimize damage to the environment.

As relevant here, the terms of the easement authorize the town
"to excavate and remove dredging material; to place dredging material; to maintain, repair and improve an existing revetment; to construct, maintain and repair a new revetment; to perform related work necessary for said purposes; to inspect the easement area and said work; to enter upon the easement area for said purposes; [and] to bring machinery and equipment into the easement area for said purposes."

In October, 1992, residents of Miramar Park sent a petition to the town requesting that a second jetty be built on the eastern side of the inlet, as a possible means of stabilizing the mouth of the river and reducing the erosion of Miramar Beach. The petition was discussed at a subsequent town meeting. Since that time, no jetty has been constructed on the eastern side of Swan Pond River.

In April, 1994, the town obtained an easement over a portion of lot 88 below the mean high water line for "public on-foot right of passage" to be exercised not earlier than sunrise or one-half hour after sunset, subject to further restrictions for protection of marine fisheries, wildlife, and erosion control. The town's board of selectmen voted to accept the easement "for the purposes of dredging the mouth of Swan River and placing dredge spoils on the east side of Swan River," conditioned on a public right of access to walk on the area below the high tide line. Both the language of the easement and the attached sketch indicate that the land that was nourished in 1996 was below the mean high water mark, a form of beach nourishment that is prohibited under the current permits, which all require nourishment only above the mean high water line. In his letter approving the town's request for an environmental impact assessment report for its ten-year comprehensive plan, the Secretary of the Department of Energy and Environmental Affairs noted that, should any areas of private beach be nourished with dredging spoils, as indicated in the areas designated 2 and 3 along Nantucket Sound, the landowners would be required to provide the town with an easement for a right of public access below the mean high water mark.

The record contains the full order of conditions for the beach nourishment project, and limited portions of the conditions imposed for the Swan Pond River dredging project.

The Miramar Avenue Association was the unincorporated predecessor of the Miramar Park Association.

Lot 88 has 122.49 feet of beachfront along Nantucket Sound; the town owns 6.8 miles (35,904 feet) of beaches on Nantucket Sound and Cape Cod Bay, as well as three rivers that provide navigation, fishing, and recreational use. Miramar Beach thus represents a very small fraction of the length of the town's beaches.

The Superior Court judge who denied the plaintiffs' motion for a temporary injunction commented in discussing the likelihood of success that the town had many defenses, including that the action was time barred. The town did not raise any argument concerning the statute of limitations and did not suggest in the Superior Court or in its appellate filings that the plaintiffs' complaint was time barred. We note, however, that actions under G. L. c. 214, § 7A, are subject to the statute of limitations applicable to the statute or regulation purportedly violated. See Canton v. Commissioner of Mass. Highway Dep't, 455 Mass. 783, 786, 919 N.E.2d 1278 (2010). An action under the wetlands protection act, under which 310 Code Mass. Regs. § 10.27 is promulgated, must be brought within two years of the violation. See G. L. c. 131, § 91. An appeal from a decision by an agency, pursuant to G. L. c. 30A, § 14, must be filed in the Superior Court within thirty days of the issuance of the agency's determination. Of course, if an order of conditions from the extension of the jetty required the town to conduct some form of ongoing dredging in perpetuity, an action to enforce such a condition would not be time barred.

The plaintiffs mentioned this argument in passing in their response to the town's cross motion for summary judgment.

General Laws. c. 131, § 40, provides, in pertinent part,
"If after said hearing the conservation commission ... determine[s] that the area on which the proposed work is to be done is significant to public or private water supply, to the groundwater supply, to flood control, to storm damage prevention, to prevention of pollution, to protection of land containing shellfish, to the protection of wildlife habitat or to the protection of fisheries or to the protection of the riverfront area consistent with the following purposes: to protect the private or public water supply; to protect the ground water; to provide flood control; to prevent storm damage; to prevent pollution; to protect land containing shellfish; to protect wildlife habitat; and to protect the fisheries, such conservation commission ... shall by written order within twenty-one days of such hearing impose such conditions as will contribute to the protection of the interests described herein, and all work shall be done in accordance therewith. If the conservation commission ... make[s] a determination that the proposed activity does not require the imposition of such conditions, the applicant shall be notified of such determination within twenty-one days after said hearing. Such order or notification shall be signed by ... a majority of the conservation commission ..., and a copy thereof shall be sent forthwith to the applicant and to the department."

We address the plaintiffs' substantive claims, notwithstanding the absence of any timely appeal to any of the permitting agencies involved or to the Superior Court, because the town does not raise any issue of timeliness in its defense.

Given our conclusion that the summary judgment record cannot support a conclusion that the 1990s extension of the jetty triggered the requirements of 310 Code Mass. Regs. § 10.27, we need not decide whether the extension of an existing jetty, in addition to the construction of a new jetty, could ever trigger any obligations under 310 Code Mass. Regs. § 10.27.

In cases where a conservation committee allows a project to proceed, any aggrieved parties may appeal from the decision to the DEP. See 310 Code Mass. Regs. § 10.05(3)-(7). See generally Mostyn v. Department of Envtl. Protection, 83 Mass.App.Ct. 788, 791-793 & nn.13 & 14, 989 N.E.2d 926 (2013) (owner of adjacent property has standing to challenge order of conditions for permitted activity on sand dune, which is governed by 310 Code Mass. Regs. § 10.28 ). Such an appeal presumably would have been available to the plaintiffs if they wished to challenge an order of conditions for the early 1990s jetty project; a claim to DEP would have required that the plaintiffs demonstrate harm to the environment from the extension of the jetty or the absence of a sand bypass system. See 310 Code Mass. Regs. § 10.27.

If an order of conditions requiring perpetual renourishment of Miramar Beach by the town had been included in the record, the plaintiffs then would have had to overcome the additional requirement of showing harm to the environment from the failure to comply with any such order. The town points to the numerous determinations by regulatory agencies that the Swan River dredging project and the West Dennis Beach nourishment project are environmentally beneficial as indicating that summary judgment for the plaintiffs should have been denied on this ground alone, a question we need not decide.

The town argues also that the order requiring it periodically to renourish Miramar Beach with the spoils of dredging Swan Pond River conflicts with DEP's regulation on dredging, 310 Code Mass. Regs. § 9.40(4), which provides that, "in the case of a publicly-funded dredging project, [spoils from dredging] shall be placed on publicly-owned eroding beaches." It is undisputed that the dredging of Swan Pond River is publicly funded and that West Dennis Beach, the location at which the town deposited the spoils, as provided in the permit, is a public beach that has experienced significant erosion. Because of our result, we do not reach this issue. For similar reasons, we need not address the town's argument that the procurement act, G. L. c. 30B, prevents it from depositing the spoils of a public dredging project on Miramar Beach, a private beach. We note, however, that the procurement act applies only to tangible items "no longer useful to the government," and that, here, the spoils were useful to the town in renourishing West Dennis Beach as well as other town beaches. See G. L. c. 30B, § 15 (a ).